**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DARNELL TAYLOR,<br><br>*Plaintiff*,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>*Defendant*. | Civil Action No. 23 - 1117 (SLS)<br>Judge Sparkle L. Sooknanan |

## <u>MEMORANDUM OPINION</u>

Darnell Taylor is a former employee of the District of Columbia Department of Public Works (DPW). Before he resigned, he worked as a sanitation crew chief who drove trash and recycling collection trucks and supervised other sanitation workers. Mr. Taylor has congestive heart failure and gastroparesis, a stomach condition that periodically causes him severe abdominal pain and nausea. In 2022, DPW reassigned Mr. Taylor to a temporary light-duty position at the DPW Training Academy as an accommodation for his congestive heart failure. While serving in that position, he experienced a severe gastroparesis "flare-up" that incapacitated him while at work. After the flare-up, DPW refused to let Mr. Taylor return to work until he provided updated medical documentation showing that he could safely do his job. Mr. Taylor did not do so and instead remained on leave until he eventually resigned. Mr. Taylor brought this lawsuit against the District of Columbia alleging disability discrimination under the Americans with the Disabilities Act (ADA), the D.C. Human Rights Act (DCHRA), and the Civil Rights Act, as well as interference and retaliation under the Family and Medical Leave Act (FMLA). Both Parties have moved for summary judgment. The Court concludes that Mr. Taylor has not produced sufficient evidence to support any of his claims. It thus grants summary judgment in favor of the District.

**BACKGROUND**

A.      **Factual Background**

The Court draws the facts from the Parties' Statements of Material Facts and the underlying materials referenced in those statements. *See* Def.'s Statement of Material Facts (DSOF), ECF No. 40-2; Pl.'s Statement of Material Facts (PSOF), ECF No. 41-2; Def.'s Resp. to PSOF, ECF No. 42-1. The Court assumes the facts in those statements to be true unless they have been specifically disputed. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

Mr. Taylor began working at DPW in October 2002. PSOF ¶ 1. Over the years, he worked his way up from a temporary position as a "leaf season Motor Vehicle Operator" to a "career appointment as a Road Sweeper Operator." PSOF ¶¶ 1–2. In September 2019, Mr. Taylor was promoted to the position of Sanitation Crew Chief (SCC). PSOF ¶ 2. As an SCC, he was responsible for "driving trash and recycling collection trucks, directing the sanitation crew, and ensuring the collection vehicles [were] properly maintained and in good working order." PSOF ¶ 3. His SCC duties also included "picking up trash cans and other bulky refuse to load into trash collection trucks, . . . sweeping alleys and streets . . . assist[ing] sanitation workers at the back of the trash collection truck or work[ing] as a sanitation worker if DPW [was] short staffed," as well as "perform[ing] special services such as walking to dwellings and carrying trash for old, ill, or disabled citizens." DSOF ¶¶ 3–4; Def.'s Mot., Ex. G, SCC Job Description, ECF No. 40-3.[2]

---

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). The Court notes that Mr. Taylor did not oppose the District's Motion for Summary Judgment or respond to the District's Statement of Material Facts. He did, however, file his own Motion for Summary Judgment. The Court has thus looked to Mr. Taylor's motion and his supporting Statement of Material Facts to determine which of the District's factual assertions he disputes.

[2] Mr. Taylor argues that any duties requiring him to get off the truck and lift heavy items were "secondary and minimal duties," but he does not dispute that they were SCC duties. Pl.'s Mot.

In 2019, the same year he was promoted to the SCC position, Mr. Taylor began receiving medical treatment for gastroparesis, a stomach condition that periodically causes Mr. Taylor "abdominal pain, nausea, and vomiting." PSOF ¶¶ 4–5. Mr. Taylor's gastroparesis "flare-ups" can happen "suddenly and without warning." PSOF ¶ 5. When they occur, Mr. Taylor "is unable to function or perform his job duties." PSOF ¶ 5. In October 2020, Mr. Taylor applied for FMLA leave that would allow him to be absent from work 1–2 times per month when he had gastroparesis flare-ups. PSOF ¶¶ 6–7. DPW approved the request and granted Mr. Taylor 320 hours of leave to be used between October 2020 and October 2022. PSOF ¶ 8. By March 2021, however, Mr. Taylor had used up the 320 hours and so he submitted a second FMLA request for more hours. PSOF ¶ 9. Mr. Taylor's medical documentation in support of that request noted that the abdominal pain he experienced during flare-ups made him unable to perform "[a]ll duties during dates of incapacity." PSOF ¶ 9. DPW granted Mr. Taylor's request and gave him 192 additional hours to use between April 2021 and April 2023. PSOF ¶ 9. But these additional hours also proved insufficient. In November 2021, Mr. Taylor submitted a third FMLA leave request "to manage his gastroparesis." PSOF ¶ 10. And again, DPW granted it, giving Mr. Taylor 448 more FMLA leave hours for a total of 640 hours to use between April 2021 and April 2023. PSOF ¶ 12.

Since 2019, Mr. Taylor has also been receiving treatment for "congestive heart failure." PSOF ¶ 13. In November 2021, Mr. Taylor applied for an ADA accommodation related to that condition. DSOF ¶ 18; Def.'s Mot. Ex. Q, Nov. 2021 ADA Request, ECF No. 40-3. Mr. Taylor's request indicated that it was "difficult[] for [him] to run behind the vehicle for 4-6 hrs collecting the trash." Nov. 2021 ADA Request. And in support of the request, Mr. Taylor's doctor stated that

Summ. J. 3–5, ECF No. 41; *see also* Taylor Dep. Tr. 20:14–22:10, 23:2–9, 149:8–13; ECF No. 40-3.

he required "accommodations that restrict heavy lifting and hauling as well as intense running," but that he could "bend[,] walk[,] and lift objects up to 30lbs intermittently." DSOF ¶¶ 19–20. Kim McDaniel, DPW's Labor and Employee Relations Advisor, reviewed Mr. Taylor's request and consulted another administrator about what "positions met [Mr. Taylor's] restrictions." DSOF ¶ 21; PSOF ¶ 20. Ultimately, Ms. McDaniel offered Mr. Taylor a "temporary accommodation" of a 90-day detail to the Training Academy where he would not be required to do any heavy lifting. PSOF ¶¶ 21–23. At the end of the detail, Mr. Taylor would "either return to his full duty position or submit updated medical documentation to DPW." PSOF ¶ 23. Mr. Taylor accepted the accommodation. PSOF ¶ 24.

Mr. Taylor began his detail at the Training Academy on February 14, 2022. PSOF ¶ 23. His role at the Academy was "to assist students preparing to test for their commercial driver's license," and his duties included "fueling and driving training trucks around the yard, setting up cones for the driving course, distributing paper materials, and ensuring the students used industry-specific jargon." PSOF ¶ 26. Shortly after beginning his detail, Mr. Taylor contacted Ms. McDaniel to ask what would happen when his detail ended. PSOF ¶ 28. She explained that there were no permanent positions available at the Training Academy and that he would not be able to return to his SCC position unless he received clearance from his treating physician. PSOF ¶ 28. Accordingly, she advised him to look for other positions in the D.C. government that would be a better fit "based on [his] medical restrictions" or to consider seeking "disability benefits." PSOF ¶ 28. On April 14, 2022, Ms. McDaniel offered to extend Mr. Taylor's detail by one month until June 13, 2022, but again reminded him that "the detail was temporary" and that he should "explore other employment options." PSOF ¶¶ 29–30. Mr. Taylor accepted the offer. PSOF ¶ 32.

During his time at the Training Academy, Mr. Taylor's ability to work was regularly affected by his gastroparesis. DSOF ¶¶ 28–32. According to Mr. Taylor's supervisor, Training Specialist Corey LaBoard, and one of Mr. Taylor's colleagues, Ralph Deville, Mr. Taylor was often so sick that he would vomit. DSOF ¶ 30, 26. While both Mr. LaBoard and Mr. Deville believed that Mr. Taylor was trying to do his job, they routinely observed that his sickness interfered with his ability to do so. Laboard Aff., Ex. W ¶ 16, ECF No. 40-4; Deville Aff., Ex. BB ¶ 5, ECF No. 40-4. Mr. LaBoard noted that Mr. Taylor "always complained about his stomach" and that his stomach pain would "break[] him down to the point where he [could not] do anything." LaBoard Aff. ¶ 8. Mr. Deville estimated that Mr. Taylor "was sick and complained about being sick . . . approximately 8 ½ days out of 10." Deville Aff. ¶ 8. On several occasions, Mr. Taylor had to leave the Training Academy early to go to the hospital. DSOF ¶ 31; *see also* LaBoard Dep. 167:14–20, ECF No. 40-4. And in one instance, Mr. Taylor left the Academy to get to the doctor and took the keys to the trash trucks with him, causing a "major disruption because without those keys DPW was unable to move its vehicles from the training lots." DSOF ¶ 32. Mr. LaBoard also received complaints from other staff that Mr. Taylor spent time in the "trucks with the seat reclined rather than assisting students." DSOF ¶ 28.[3]

Matters came to a head on May 17, 2022, when Mr. Taylor experienced a gastroparesis flare-up while accompanying a training team and students to a testing site. PSOF ¶¶ 33–34. On the way to the site, Mr. Taylor became ill and threw up out the window of the vehicle he was riding in. PSOF ¶ 36; Def.'s Mot., Ex. C, Taylor Dep. Tr. 152:9–12, ECF No. 40-3. Once he reached the site, he lay on the ground and said that he was in so much pain that he wanted to die. DSOF ¶ 41.

---

[3] Mr. Taylor's Statement of Facts adopts many of the facts in the District's Statement word for word. While Mr. Taylor does not affirmatively adopt all the facts summarized in this paragraph, he also does not dispute them or point to evidence that calls them into question.

Mr. LaBoard contacted Ms. McDaniel to inform her that Mr. Taylor "was at work laying on the ground and provided her with a photograph of the same." PSOF ¶ 38. Mr. LaBoard then instructed Mr. Deville to take Mr. Taylor back to the Academy. PSOF ¶ 39.

Later that day, Ms. McDaniel informed Mr. Taylor by email that he "could not report back to work until DPW received a release from [his] treating physician and [Ms.] McDaniel had an opportunity to speak to that physician." PSOF ¶ 40. She directed Mr. Taylor to submit his documentation and his physician's contact to Annie Johnson, DPW's HR Specialist and FMLA Coordinator. PSOF ¶ 40. Mr. Taylor replied that, "Ms. Johnson has all the paperwork for me already pertaining to my health issues that I went through yesterday. This is what I have FMLA for." PSOF ¶ 42. Later that day, Ms. Johnson emailed Mr. Taylor requesting "updated medical documentation for [his] ADA reasonable accommodation request, as the medical note [he] provided was insufficient." PSOF ¶ 43.

About two weeks later, Mr. Taylor submitted another ADA request dated May 30, 2022, "seeking an accommodation based on his [congestive heart failure]." PSOF ¶ 44. The request did not mention his gastroparesis, and neither did the supporting documentation from his medical provider, which only discussed Mr. Taylor's congestive heart failure and the accommodations he required for that condition, PSOF ¶¶ 44–46; DSOF ¶ 48. At no point did Mr. Taylor ever request an ADA accommodation related to his gastroparesis. PSOF ¶ 49.

On June 14, 2022, Ms. McDaniel informed Mr. Taylor that she had spoken with his physician. PSOF ¶ 47. She explained that he could not return to his SCC position because of his "medical restrictions as outlined by [his] treating physician," and that there were no available positions with "light duty work" that he could do. PSOF ¶ 47. She noted that the Training Academy was "at capacity" and that, even if it were not, he had demonstrated while on detail that he was

6

"physically unable to do the work." PSOF ¶ 47. Ms. McDaniel told Mr. Taylor that he could continue to use his leave, "including annual, sick, and/or leave without pay," but encouraged him to "look into short term and long term disability benefits" that might be available through the D.C. government. PSOF ¶ 47.

Mr. Taylor remained on leave until he eventually resigned and submitted paperwork to obtain his retirement benefits. DSOF ¶ 52; PSOF ¶ 48. He no longer works at DPW. *Id.*

## B.    Procedural Background

Mr. Taylor filed this lawsuit against the District of Columbia and DPW on April 21, 2023, alleging disability discrimination under the ADA (Count I), the Civil Rights Act (Count II), and the D.C. Human Rights Act (Count III), as well as interference and retaliation under the FMLA (Count IV). Compl., ECF No. 1. DPW was dismissed as a "non sui juris entity that cannot be sued separate from the District of Columbia itself." *See* Min. Order, July 18, 2023. On October 23, 2025, the District moved for summary judgment on all of Mr. Taylor's claims. Def.'s Mot. Summ. J., ECF No. 40. On October 27, 2025, Mr. Taylor cross-moved for the same. Pl.'s Mot. Summ. J., ECF No. 41. Both motions are ripe for review. Defs.' Opp'n to Pl.'s Mot. Summ. J., ECF No. 42.[4]

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006) (citations omitted). "The evidence of the non-movant is to be believed, and all

---

[4] As previously noted, Mr. Taylor did not file an opposition to the District's Motion for Summary Judgment. The cross-motion he filed four days later, however, indicates that he was aware of the District's arguments and crafted his own motion in part to respond to those arguments.

justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When "both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*, 429 F. Supp. 2d at 67 (citations omitted).

## DISCUSSION

Mr. Taylor brings disability discrimination claims under the ADA, the DCHRA, and the Civil Rights Act, as well as interference and retaliation claims under the FMLA. None of Mr. Taylor's claims survive summary judgment.

### A.    Disability Discrimination

Title I of the ADA "requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability,' and makes it unlawful to 'discriminate against a qualified individual on the basis of disability.'" *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1371 (D.C. Cir. 2020) (cleaned up) (first quoting 42 U.S.C. § 12112(b)(5)(A); and then quoting 42 U.S.C. § 12112(a)). The DCHRA imposes functionally identical requirements on employers in the District of Columbia. D.C. Code § 2–1402.11(a)(1). And disability discrimination claims under both statutes are subject to the same standards. *Pressley v. Mgmt. Support Tech., Inc.*, No. 22-cv-2262, 2023 WL 5206107, at *5 (D.D.C. Aug. 14, 2023); *see also Hunt v. District of Columbia*, 66 A.3d 987, 990 (D.C. 2013).[5]

---

[5] Mr. Taylor bases his Civil Rights Act claim on 42 U.S.C. § 1981a(a)(2). While that provision permits an individual to recover compensatory and punitive damages for intentional disability

Mr. Taylor asserts that DPW discriminated against him based on disability by: (1) denying him a reasonable accommodation, and (2) refusing to let him return to work following his May 17, 2022, gastroparesis flare-up. Pl.'s Mem. Supp. Mot. Summ. J. 7–8, ECF No. 41-1. The District argues that it is entitled to summary judgment on both claims. The Court agrees.

### 1.      Failure to Accommodate

"To prevail on a reasonable accommodation claim, a plaintiff must establish by a preponderance of the evidence that (1) [he] was a qualified individual with a disability, (2) the employer had notice of h[is] disability and (3) the employer denied h[is] request for a reasonable accommodation." *Waggel*, 957 F.3d at 1371 (cleaned up). A plaintiff is a "qualified individual" under the ADA if he has a disability and, "with or without reasonable accommodation, can perform the essential functions of [his] employment position." 42 U.S.C. § 12111(8); *see also Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999).

The District does not contest that Mr. Taylor's congestive heart failure and gastroparesis are disabilities. Nor does it argue that it was unaware of Mr. Taylor's disabilities. The viability of Mr. Taylor's claim thus turns on the third inquiry: did he request a reasonable accommodation that the District denied? *See Flemmings v. Howard Univ.,* 198 F.3d 857, 861 (D.C. Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."). No reasonable jury presented with the current record could answer that question in the affirmative.

The Parties agree that Mr. Taylor submitted at least two requests for accommodation. Both requests related to his congestive heart failure. Mr. Taylor submitted his first request in November

_____

discrimination claims brought under the ADA and the Rehabilitation Act, it does not provide a standalone cause of action. Mr. Taylor's Civil Rights Act claim thus stands or falls with his ADA claim.

2021, stating that his congestive heart failure made it difficult for him "to run behind the vehicle for 4-6 hrs collecting the trash" and providing documentation from his doctor indicating that it was "not advisable" for him to engage in any strenuous activity, such as "heavy lifting and hauling." Nov. 2021 ADA Request. After considering Mr. Taylor's request and stated limitations, DPW offered him a 90-day detail to the Training Academy where he could avoid strenuous activity. PSOF ¶¶ 20–21. Mr. Taylor accepted that accommodation and began the detail in February 2022. PSOF ¶¶ 23–24. Based on this uncontested sequence of events, no reasonable jury could find that DPW denied Mr. Taylor's November 2021 accommodation request. Indeed, Mr. Taylor's own Statement of Undisputed Material Facts states unequivocally regarding his November 2021 request that he "was granted an ADA accommodation for his [congestive heart failure]." PSOF ¶ 22.

Mr. Taylor submitted his second request for accommodation on May 30, 2022. PSOF ¶ 44; *see also* Def.'s Mot., Ex. FF, May 2022 ADA Request, ECF No. 40-4. Again, Mr. Taylor stated that he was seeking an accommodation because his congestive heart failure made it difficult for him "to run, jump, or engage in the fast paced activity" required for being "behind a truck." May 2022 ADA Request. Neither Mr. Taylor's request nor the supporting medical documentation mentioned his gastroparesis or requested any accommodation related to that condition. *Id.*

Mr. Taylor argues that this second request was effectively denied because the District did not adequately consider whether it could further accommodate him by making his assignment to the Academy permanent or by modifying his role as an SCC to ensure that he never had to run behind the truck or lift trash heavier than 30 pounds. Pl.'s Mot. at 2–3. But this argument ignores the significant change in circumstances that occurred between Mr. Taylor's two requests. Following Mr. Taylor's gastroparesis flare-up on May 17, 2022, DPW prevented him from returning to work not because of limitations related to his congestive heart failure, but because it

was concerned that his gastroparesis made him unable to do his job. As Ms. McDaniel explained in her email to Mr. Taylor following the May 17 incident, she understood that during his flare-up he "could not physically function" and that otherwise his "ability to physically function at the facility [was] very minimal." Def.'s Mot., Ex. DD, ECF No. 40-4. Based on those "observations," Ms. McDaniel explained that DPW was "concern[ed] that [Mr. Taylor] could get injured or [his] condition worsened" if he came to work and thus he could not do so "until [DPW] received a release from [his] treating physician." *Id.*

In other words, DPW's refusal to let Mr. Taylor return to work was not a refusal to accommodate his congestive heart failure. Indeed, DPW was still providing Mr. Taylor with an accommodation that was effective for the limitations imposed by his heart condition. He was still on his temporary detail to the Academy—where he could avoid strenuous activity and heavy lifting—and that detail extended until June 13, 2022. PSOF ¶¶ 22, 26, 29–32. Under those circumstances, no reasonable jury could conclude that Mr. Taylor's second request for an ADA accommodation was denied. And more importantly, the relevance of that request was superseded by DPW's concerns about Mr. Taylor's gastroparesis. It was no longer clear to DPW that accommodating Mr. Taylor's congestive heart failure was enough to ensure that he could physically do his job at the Academy or any other DPW job. *See Swanks*, 179 F.3d at 934 ("[A] 'qualified individual' is a person 'with a disability who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires.'" (emphasis added) (quoting 42. U.S.C. § 12111(8)).

Given that Mr. Taylor cannot show that he was denied a reasonable accommodation for his congestive heart failure, the only remaining question is whether he could convince a jury that he

11

requested and was denied a reasonable accommodation for his gastroparesis. He cannot carry this burden.

To begin, Mr. Taylor acknowledges that he never requested a reasonable accommodation for his gastroparesis. He affirmed this in his deposition, adding that his ADA requests were only ever related to his heart condition, and that he never even considered making such a request related to his gastroparesis. Taylor Dep. Tr. 63:7–14; 171:17–20; 165:15–21. Mr. Taylor suggests that a formal ADA accommodation request was unnecessary because the District was already aware of his gastroparesis from his prior requests for FMLA leave. Pl.'s Mem. 7, ECF No. 41-1. But the FMLA and the ADA are "fundamentally different" statutes, and the D.C. Circuit has declined to construe "requests for FMLA leave" as "requests for an ADA accommodation." *Waggel*, 957 F.3d at 1373.

It is true that under certain circumstances, a "plaintiff's need for an accommodation" may be "so apparent that the defendant must offer one regardless of whether the plaintiff requested it." *Chenari v. George Wash. Univ.*, 847 F.3d 740, 748 (D.C. Cir. 2017). Under such circumstances, however, an employer may still need "information about the nature of the individual's disability and the desired accommodation." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014). "Because an appropriate accommodation will often turn on specific facts concerning the employee's disability and the employer's workplace, the employee and employer frequently need to share information" as part of an "interactive process" aimed at finding "a workable solution." *Ali v. Regan*, 111 F.4th 1264, 1269 (D.C. Cir. 2024) (citation omitted). When an employee "withholds requested information that is relevant to determining the existence of a disability or the appropriate accommodation for it, that employee may bear responsibility for the breakdown of the interactive process, which would foreclose a failure-to-accommodate claim." *Id.* at 1270 (citation omitted).

That is exactly what happened here. The District does not dispute that it was aware of Mr. Taylor's gastroparesis and that he might require accommodation for that condition to continue working. Indeed, DPW asked Mr. Taylor for updated medical documentation about his gastroparesis in an apparent attempt to initiate the interactive process. Mr. Taylor, however, failed to provide the requested information, instead submitting an accommodation request and supporting documentation that only addressed his congestive heart failure. Under these circumstances, no reasonable jury could conclude that DPW was responsible for the breakdown in the interactive process or for any failure to accommodate Mr. Taylor's gastroparesis. *See Ward*, 762 F.3d at 32–35 (affirming grant of summary judgment for employer on failure to accommodate claim where employee did not respond to repeated requests for medical information); *see also Ali v. Pruitt*, 727 F. App'x 692, 695 (D.C. Cir. 2018) (affirming summary judgment ruling that plaintiff "abandoned the interactive process when he failed to provide supportive medical information" requested by his employer). For all the above reasons, DPW is entitled to summary judgment on Mr. Taylor's failure to accommodate claims under the ADA and the DCHRA.

### 2.    Denial of Permission to Return to Work

Outside of a reasonable accommodation claim, a plaintiff may prevail on a claim of disability discrimination under the ADA or DCHRA by showing that he (1) suffered an adverse employment action (2) because of his disability. *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). When a plaintiff lacks direct evidence of disability discrimination, claims brought under the ADA and DCHRA are evaluated under the burden-shifting framework established in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015). Under that framework, "the plaintiff bears the initial burden of demonstrating a prima facie case of discrimination." *Id.* at 6. "The burden then

13

shifts to the employer to set forth a legitimate, non-discriminatory reason for the challenged action." *Id.* If at summary judgment the employer has asserted such a reason, the question of whether the plaintiff has stated a prima facie case fades away, and "the only remaining question is whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Id.* (cleaned up).

Here, Mr. Taylor alleges that he suffered an adverse employment action when the District refused to permit him to return to work after his May 17, 2022, gastroparesis flare-up. Pl.'s Mem. 7. In response, the District has identified a legitimate non-discriminatory reason for why it would not let Mr. Taylor keep working. Namely, DPW was concerned after the May 17, 2022, incident that Mr. Taylor's disabilities "rendered him unable to perform the essential functions of a SCC, or even light duty functions at the Training Academy." Def.'s Opp'n 7–8. To address those concerns, the District requested updated medical documentation from Mr. Taylor and, at least with regard to his gastroparesis, he never provided it. *Id.* at 8. In the face of this legitimate, non-discriminatory reason, Mr. Taylor has not "produced sufficient evidence for a reasonable jury to find that [the District's] asserted nondiscriminatory reason" was in fact a pretext for discrimination. *See Giles*, 794 F.3d at 6. As explained above, Mr. Taylor did not provide the medical documentation that DPW requested, nor did he meaningfully engage in an interactive process about how his gastroparesis could be reasonably accommodated. The District was therefore justified in refusing to allow him to return to work. And there is no basis on which a jury could reasonably conclude otherwise.

Accordingly, the Court grants summary judgment to the District on Mr. Taylor's disability discrimination claims.

14

### B.    FMLA Claims

Next up are Mr. Taylor's FMLA claims. The FMLA entitles eligible employees up to "12 workweeks of leave during any 12-month period" for specified family or medical reasons, including "a serious health condition that makes the employee unable to perform" their work. 29 U.S.C. § 2612(a)(1)(D). "Employers may not 'interfere with, restrain, or deny the exercise of FMLA rights[.]'" *Waggel*, 957 F.3d at 1375 (quoting 29 U.S.C. § 2615(a)(1)). Mr. Taylor brings two claims under the FMLA. He argues that the District (1) interfered with the exercise of his FMLA rights and (2) retaliated against him for taking FMLA leave. Neither claim has merit.

As an initial matter, Mr. Taylor's claims under the FMLA are ill-defined. Mr. Taylor's brief devotes only one page of legal argument to his FMLA claims. Half of that page is a paragraph of FMLA case law that appears to have been copied and pasted directly from the District's summary judgment brief. *Compare* Pl.'s Mem. 8–9, *with* Def.'s Mem. Supp. Mot. Summ. J. 18, ECF No. 40-1. The next three sentences, which also appear to be copied and pasted from the District's brief, acknowledge that the District granted Mr. Taylor's FMLA leave requests three times, "never interfered with [Mr.] Taylor's right to take intermittent FMLA leave," and "facilitated [Mr.] Taylor's use of FMLA leave for three years." Pl.'s Mem. 9. Needless to say, it is not a strong start to Mr. Taylor's argument.

As best the Court can tell, Mr. Taylor's FMLA claims, much like his disability discrimination claims, primarily take issue with the District's refusal to let him return to work after his May 17, 2022, gastroparesis flare-up. He argues that "he was entitled to use his FMLA leave when he needed 1–2 days off per month during his gastroparesis flare-ups," Pl.'s Mot. 3; that he had previously "never had any issues with taking leave under the FMLA," Pl.'s Mem. 9; and that the District interfered with his FMLA rights and retaliated against him for exercising those rights

15

when it "treated his taking of leave" after the May 17, 2022, incident as "a demonstration he was unable to work at all," Compl. ¶ 79. The Court is not persuaded.

"To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference." *Waggel*, 957 F.3d at 1376. And to prevail on an FMLA retaliation claim, "a plaintiff must show: (1) the exercise of protected FMLA activity; (2) an adverse employment decision; and (3) a causal connection between the protected activity and the adverse action." *Id.* at 1375. FMLA retaliation claims, like the disability discrimination claims discussed above, are evaluated under the *McDonnell Douglas* framework. *Id.* This means that an employer may rebut a plaintiff's prima facie case of retaliation by "putting forward evidence of a legitimate, nonretaliatory reason for the adverse action." *Id.* The plaintiff must then "identify evidence of pretext . . . to overcome the employer's rebuttal and survive summary judgment." *Id.* at 1375–76.

Addressing interference first, Mr. Taylor expressly concedes in his motion that the District never interfered with his taking of "intermittent FMLA leave" prior to May 17, 2022. Pl.'s Mem. 9. The only remaining question is whether the District's refusal to let Mr. Taylor return to work after May 17, 2022, amounted to interference with his FMLA rights. Based on the record evidence, no reasonable jury could reach that conclusion. On the contrary, the District appears to have required Mr. Taylor to use his FMLA leave until DPW could assess whether there was a job he could safely do, and told him he could "continue to use [his] leave, including annual, sick, and/or leave without pay" while encouraging him "to look into short term and long term disability benefits." PSOF ¶¶ 40, 47.

Mr. Taylor's FMLA retaliation claim is similarly deficient. It fails for much the same reason as his disability discrimination claims under the ADA and the DCHRA. To briefly rehash, the District has provided a legitimate, non-discriminatory reason for why it would not let him return to work: it was concerned that he could not do so safely. In response, Mr. Taylor has not produced evidence to support that this reason was pretextual. Rather, the record suggests that the District always gave Mr. Taylor the FMLA leave that he requested and only kept him from returning to work when his gastroparesis appeared to prevent him from doing any job safely. And the record further suggests that Mr. Taylor never provided the District with updated medical documentation that could address its concerns.[6]

Accordingly, Mr. Taylor's FMLA claims also must fail.

### CONCLUSION

For all these reasons, the Court grants the District's Motion for Summary Judgment, ECF No. 40, and denies Mr. Taylor's Motion for Summary Judgment, ECF No. 41.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:    March 31, 2026

---

[6] Mr. Taylor's Complaint also appears to allege a retaliation claim under the ADA. *See* Compl. ¶¶ 47, 57–58. Mr. Taylor's motion, which purports to seek summary judgment on each of his claims, does not discuss that claim, *see generally* Pl.'s Mot. And Mr. Taylor did not oppose the District's motion, which explicitly seeks summary judgment on any retaliation claims under the ADA or the DCHRA. Def.'s Mem. Supp. Mot. Summ. J. 16–17, ECF No. 40-1. The Court thus deems Mr. Taylor to have forfeited any retaliation claims that he might have brought under those statutes. *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014) ("[A] plaintiff's failure to raise arguments or theories in its motion for summary judgment results in waiver of those arguments."). But even were those claims not forfeited, they would be evaluated under the same framework as Mr. Taylor's FMLA retaliation claim, *see Harris v. CNN America, Inc.*, No. 23-cv-3526, 2026 WL 491447, at *11 (D.D.C. Feb. 23, 2026), and would fail for the same reasons.